# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **EDWARD ELWOOD WILLIAMS,** )<br>    Plaintiff                      )<br>                                    )<br>v.                                   )<br>                                    )<br>**MICHAEL J. ASTRUE,**        )<br>  **Commissioner of Social Security,** )<br>    Defendant                 )<br>                                    ) | Civil Action No. 1:11cv00074<br><br>**REPORT AND RECOMMENDATION**<br><br>BY: PAMELA MEADE SARGENT<br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Edward Elwood Williams, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Williams filed a previous claim for DIB on February 5, 2002, and, after the ALJ issued an unfavorable decision on April 18, 2003, Williams requested review by the Appeals Council. However, while pending Appeals Council review, Williams filed another DIB application on June 12, 2003, which was denied by ALJ decision on July 28, 2003, and for which the Appeals Council denied review on September 4, 2003. Williams did not appeal this decision further. The record shows that Williams protectively filed his current applications for DIB and SSI on November 7, 2007, alleging disability as of January 31, 2002, due to a heart condition, hypertension, stomach problems, anxiety, depression, back pain, arthritis and bipolar disorder. (Record, ("R."), at 14, 144, 152, 202, 212.) The claims were denied initially and on reconsideration. (R. at 91-93, 96-97, 101, 105-07, 108-09.) Williams then requested a hearing before an administrative law judge, ("ALJ"). (R. at 110.) A hearing was held on March 9, 2010, at which Williams was represented by counsel. (R. at 35-86.)

By decision dated April 29, 2010,[1] the ALJ denied Williams's claims. (R. at

---

[1] The relevant time period for the court's review of Williams's SSI claim is November 7, 2007, the date of the application, through April 29, 2010, the date of the current ALJ's decision. However, the relevant period of review for Williams's DIB claim is April 19, 2003, the day following the date of the prior ALJ's decision, through December 31, 2007, the date last insured.

-2-

14-30.) The ALJ found that Williams met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2007. (R. at 28.) The ALJ also found that Williams had not engaged in substantial gainful activity at any time during the period of April 19, 2003, the day following the date of the previous ALJ's decision, through March 9, 2010, the date of the hearing. (R. at 28.) The ALJ determined that the medical evidence established that Williams had severe impairments, namely congenital heart problems status-post surgery; hypertension; degenerative disc disease; obesity; increased cholesterol and left ulnar neuropathy, but she found that Williams did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-21.) The ALJ also found that Williams had the residual functional capacity to perform a range of sedentary[2] work that did not require reaching overhead, climbing ladders, ropes or scaffolds, working at unprotected heights or operating open and dangerous machinery, which provided a temperature-controlled work environment, which required no more than occasional climbing of ramps and stairs, kneeling, balancing, crouching, crawling or stooping/bending and which did not require working with the public. (R. at 29.) The ALJ specifically noted that, while Williams had a mild reduction in gripping, fingering and feeling with the left hand, he did not have a significant reduction in his ability to use the left hand. (R. at 29.) The ALJ found that Williams was unable to perform his past relevant work as a machine operator. (R. at 29.) Based on Williams's age, education, work experience and residual functional capacity and the testimony of a vocational

---

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting and carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2012).

expert, the ALJ found that jobs existed in significant numbers in the national economy that he could perform, including unskilled sedentary clerical jobs and the sedentary job of a machine monitor. (R. at 28.) Thus, the ALJ found that Williams was not under a disability as defined under the Act at any time during the period of April 19, 2003, through March 9, 2010, and was not eligible for benefits. (R. at 29-30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2012).

After the ALJ issued her decision, Williams pursued his administrative appeals, (R. at 141-42), but the Appeals Council denied his request for review. (R. at 1-5.) Williams then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2012). The case is before this court on Williams's motion for summary judgment filed March 21, 2012, and the Commissioner's motion for summary judgment filed April 18, 2012.

## *II. Facts[3]*

Williams was born in 1970, (R. at 144, 152), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Williams has a high school education with some college instruction and some electrical training. (R. at 207-08.) He has past relevant work experience as a machine operator. (R. at 203.) Williams testified at his hearing that he had last worked as a machinist approximately five or six years previously, but had to quit due to symptoms

---

[3] Williams's arguments on appeal concern whether the ALJ properly assessed his left hand impairment. Only the facts relevant to resolution of this case are included in this Report and Recommendation. To the extent that any other facts are included herein, it is for background purposes only.

resulting from a cardiac impairment. (R. at 44-45.) However, Williams acknowledged that he did "finishing work" for his father-in-law, a drywall contractor, approximately four to five days monthly for four to six hours each day. (R. at 58-59.) More specifically, Williams testified that he covered seams or nail holes in the drywall with mud, using a trowel and a pan weighing up to 10 pounds. (R. at 60.) Williams testified that he could perform such activities as peeling potatoes, doing a little laundry and other similar housework. (R. at 65.) He further testified that he tried to wash dishes and cook, stating that he was a "very good cook," but it took him a little longer because he could only stand for a certain amount of time due to back problems. (R. at 66.) Williams estimated that he prepared three meals weekly for his family. (R. at 66.) He testified that he had a trapped ulnar nerve and had not been able to feel the last two fingers on his left hand since sometime the previous year. (R. at 74.)

Leah P. Salyers, a vocational expert, was present and testified at Williams's hearing. (R. at 79-84.) Salyers classified Williams's past work as a machine operator as semi-skilled, primarily medium[4] work.[5] (R. at 81.) Salyers was asked to consider a hypothetical individual of Williams's age, education and work history who could perform work at the sedentary exertional level, who would have mild problems gripping with the left hand due to numbness of two fingers, but who could effectively use the left hand for most gross-type activities and grasping most

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2012).

[5] Salyers testified that Williams's job as a machine operator ranged from medium to heavy work, but was primarily medium work. (R. at 81.)

of the time. (R. at 82.) This individual also could perform fine manipulation with the other fingers most of the time, but should not reach overhead, should not climb ladders, should not work at heights, should not operate heavy, dangerous machinery, should not work with the public and who should work in an indoor, temperature-controlled environment. (R. at 82.) Salyers testified that such an individual could perform a range of unskilled clerical work, noting that at least 4,500 such positions existed in the region and at least 95,000 in the nation. (R. at 83.) Salyers further testified that such an individual could perform the job of a machine monitor, noting that at least 600 such positions existed in the region and about 80,000 in the nation. (R. at 83.) She stated that her answers were consistent with the Dictionary of Occupational Titles, ("DOT"). (R. at 83.) Salyers next was asked to consider the same hypothetical individual, but who would be off-task up to one-fourth of the day due to a variety of causes. (R. at 83.) She testified that such an individual could perform no jobs. (R. at 83.) When asked about the same individual, but whose hand limitation was moderate, resulting in an inability to utilize the full function of the hand for up to one-fourth of the day, Salyers testified that the individual could perform no jobs. (R. at 84.)

In rendering her decision, the ALJ reviewed records from Duke University Medical Center; Wellmont Bristol Regional Medical Center; Dr. Mark A. Borsch, M.D.; Dr. Ashvin Patel, M.D.; Louis Perrott, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Thomas Phillips, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Mountain Empire Neurological Associates; Cardiovascular Associates; Sapling Grove Urgent Care, Dr. Daniel Milam, D.O.; Dr. Todd Nairn, M.D.; and Dr. Eduardo Fernandez, M.D.

The record shows that Williams suffers from a congenital heart defect, namely a bicuspid aortic valve, ascending aortic dilation and coarctation of the aorta[6] status-post two repairs, one in 1970 and another in 1995. (R. at 366, 506-08, 516.) A third surgery was considered in August 2002, but Dr. Thomas M. Bashore, M.D., a cardiologist at Duke University Medical Center, following a cardiac catheterization, determined that there was not enough coarctation to suggest that surgical intervention was necessary. (R. at 229-35.) Williams also has a history of appendectomy, cholecystectomy and resection of Meckel's diverticulum.[7] (R. at 249-50, 266-67, 273-75.) Williams has documented diagnoses of degenerative disc disease, hypertension and sleep apnea.

On May 19, 2008, Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Williams could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 393-99.) Dr. McGuffin found that Williams could stand and/or walk for about six hours in an eight-hour workday and could sit for about six hours in an eight-hour workday. (R. at 394.) He found that Williams's ability to push and/or pull was unlimited, other than the lift and/or carry restrictions. (R. at 394.) Dr. McGuffin found that Williams could occasionally climb, stoop, kneel, crouch and crawl and could frequently balance. (R. at 395.) He imposed no manipulative limitations. (R. at 395.) Finally, Dr. McGuffin found that Williams should avoid all exposure to hazards. (R. at 396.) He deemed

---

[6] Coarctation of the aorta is a localized malformation characterized by a deformity of the aortic media, causing narrowing, usually severe, of the ileum of the vessel. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 350 (27th ed. 1988).

[7] Meckel's diverticulum is an occasional sacculation or appendage of the ileum, derived from an unobliterated yolk stalk. *See* Dorland's at 502.

Williams's statements partially credible. (R. at 399.)

On August 6, 2009, Williams saw Dr. Alfred L. Harkleroad, M.D., at Sapling Grove Urgent Care, with complaints of tingling in the arms and a feeling that the ulnar three fingers of the left hand were "asleep." (R. at 442-43.) Physical examination showed normal motor strength in both hands, negative Tinel's sign, negative Phalen's sign and a negative reverse Phalen's sign in both hands, as well as good strength in the upper extremities. (R. at 443.) Dr. Harkleroad referred Williams for nerve conduction studies. (R. at 443.) On August 12, 2009, Williams saw Dr. Steven W. Morgan, M.D., at Mountain Empire Neurological Associates, with complaints of numbness and tingling in the left upper extremity. (R. at 423-27.) Williams described numbness and tingling in the left hand to elbow, which began approximately three weeks previously. (R. at 424.) Physical examination showed good strength and tone without atrophy, negative Tinel's sign and intact sensation to light touch, pinprick and vibration, except for the left fifth digit, which had reduced sensation to light touch and pinprick. (R. at 424.) Williams also had intact position sense and good coordination. (R. at 424.) Dr. Morgan performed an electromyogram, ("EMG"), the results of which were consistent with an injury to the ulnar nerve in the left arm, just distal to, or at, the elbow. (R. at 427.) There was no active denervation, but some neuropraxia in this distribution was present. (R. at 427.) Dr. Morgan concluded that the EMG study was consistent with a left ulnar mononeuropathy at or just distal to the cubital tunnel. (R. at 423.) On August 20, 2009, Williams saw Dr. Todd Nairn, M.D., to discuss the results of the EMG. (R. at 440.) Williams stated that, although he had received a brace to wear, it had worsened his symptoms. (R. at 440.) Nonetheless, Dr. Nairn did not modify his treatment plan.

Williams saw Dr. Daniel Milam, D.O., on September 1, 2009, for evaluation of the left elbow and hand. (R. at 444-45.) Williams stated that he had experienced pain and numbness in the middle, ring and small fingers of the left hand for the previous six weeks. (R. at 444.) He denied any injury to the elbow or hand and stated that he had been taking Motrin, although at "subtherapeutic" doses. (R. at 444.) Williams also noted some weakness of the left upper extremity, especially with strong grasps such as opening jars. (R. at 444.) Physical examination showed Williams was in no acute distress. (R. at 444.) The left upper extremity was neurovascularly intact distally with respect to motor function of the radial, median and ulnar nerves. (R. at 444.) He had brisk capillary refill to all digits, as well as palpable radial and ulnar pulses. (R. at 444.) There was no pain to palpation or range of motion of the wrist, elbow or shoulder, and there was no restriction to range of motion of the wrist, elbow or shoulder. (R. at 444.) Dr. Milam noted a negative Tinel's and Phalen's sign at the wrist for carpal tunnel syndrome, but Williams did have a very mildly positive Tinel's sign at the elbow and a negative Phalen's sign for cubital tunnel syndrome. (R. at 444.) Dr. Milam could not appreciate the ulnar nerve subluxing anteriorly over the medial epicondyle as Williams's elbow was placed through a range of motion. (R. at 444.)

Dr. Milam reviewed the EMG of Williams's left upper extremity, noting that it showed left ulnar mononeuropathy at, or just distal to, the cubital tunnel localized to the elbow region, with no evidence of active denervation. (R. at 444.) He diagnosed mild left cubital tunnel syndrome. (R. at 445.) He noted that Williams had been dealing with this for only six weeks and had not had an adequate trial of anti-inflammatories or night splinting. (R. at 445.) Dr. Milam

advised Williams to continue Motrin, but at a therapeutic dose, for the next three to four weeks. (R. at 445.) He also instructed Williams on a course of night splinting and placing a pillow or rolled up towel on the antecubital fossa to prevent the elbow from flexing beyond 90 to 100 degrees. (R. at 445.) Dr. Milam noted that if Williams continued to have symptomatology, he may be a candidate for ulnar nerve decompression, but due to his other underlying medical comorbidities, he would be at severe risk for complications. (R. at 445.) Dr. Milam advised Williams to follow up with him in a month by telephone to inform him of his progress and, if he did not have adequate symptom relief, he would see him again for repeat exam and further planning. (R. at 445.)

Williams was seen at Heart & Vascular Blue Ridge Physicians Group on December 8, 2009, to establish himself as a new patient. (R. at 549-56.) Williams reported numbness and tingling in the hands. (R. at 552.) He was in no acute distress, and inspection and palpation of the extremities, including digits and nails, revealed no clubbing, cyanosis, edema, significant petechiae or ischemia. (R. at 555.) There were no motor or sensory deficits. (R. at 555.) On December 15, 2009, Williams again was in no apparent distress, and his strength was equal and symmetric in the upper extremities. (R. at 563-64.) Williams also saw Dr. Nairn on this date, at which time he reported no generalized decrease in strength. (R. at 538.) In a letter "To Whom It May Concern," dated December 21, 2009, Dr. Nairn stated that "due to heart and back problems my patient, Eddie Williams, can not be gainfully employed." (R. at 543.) On January 12, 2010, Williams was in no apparent distress, and strength was equal and symmetric in the upper extremities. (R. at 547.)

-10-

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2012); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2012).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2012); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Williams argues that the ALJ's residual functional capacity finding is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-12.) Specifically, Williams argues

-11-

that the ALJ failed to properly consider his left upper extremity impairment and related limitations. (Plaintiff's Brief at 9-11.) Williams also argues that the vocational expert's testimony that he could perform a significant number of jobs in the national economy was based on an improper hypothetical and, therefore, cannot constitute substantial evidence for the ALJ's disability determination. (Plaintiff's Brief at 11-12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

-12-

Williams argues that the ALJ erred by failing to properly consider his upper extremity impairment and resulting limitations in making her residual functional capacity determination. (Plaintiff's Brief at 8-12.) For the following reasons, I disagree. The ALJ found that Williams, who is right-handed, had no significant decrease in the ability to use the left hand despite a mild reduction in gripping, fingering and feeling. (R. at 29.) Such a finding is supported by the medical evidence of record. Williams bases his argument on his diagnosis of a trapped ulnar nerve in the left arm with resulting inability to feel two fingers in the left hand. He first notes Dr. Bashore's August 2002 finding of decreased blood pressure in the left arm, as well as Dr. Mark A. Borsch's March 2003 notation of swelling in the hands. However, these findings were linked to Williams's cardiac impairment, not a hand impairment and, therefore, are not relevant to Williams's argument. The court further notes that these findings preceded Williams's complaints of left hand numbness and tingling by at least six years. Williams did not complain of any problems with his left hand until August 6, 2009, approximately seven years after the alleged onset date. (R. at 442-43.) At that time, he reported that the last three fingers of the left hand felt like they were asleep for the previous week. (R. at 442-43.) However, physical examination showed normal motor strength in the hands and good strength in the upper extremities. (R. at 443.) Moreover, Williams's Disability Reports, completed in 2007 and 2008, did not allege any problems with his left hand. (R. at 202, 212, 224.) To further support his argument, Williams notes findings from February through May 2009 of limb weakness, tingling and numbness, as well as his complaints in August 2009, which precipitated the performance of nerve conduction studies that showed left ulnar mononeuropathy at, or just distal to, the

-13-

cubital tunnel. While Dr. Milam diagnosed left cubital tunnel syndrome, he classified it as "mild," and he placed no restrictions on Williams as a result thereof. (R. at 445.)

It is well-settled that a diagnosis alone is not sufficient to make a finding of disability. There must be functional limitations associated therewith significant enough to prevent the performance of substantial gainful activity. Such is not the case here. In fact, no treating source placed any limitations on Williams as a result of his left cubital tunnel syndrome. Although a residual functional capacity assessment was completed by a state agency physician, it predates any complaints by Williams of his left upper extremity problems by more than a year. Moreover, when Williams complained of pain and numbness in the fingers of the left hand to Dr. Milam in September 2009, he reported taking only "subtherapeutic" doses of Motrin for pain relief. (R. at 444.) Williams also complained of some weakness of the left upper extremity, especially when performing strong grasping activities. (R. at 444.) Nonetheless, physical examination showed the left upper extremity was neurovascularly intact regarding motor function of the radial, median and ulnar nerves, and there was brisk capillary refill in all fingers and palpable radial and ulnar pulses. (R. at 444.) There was no edema or atrophy, and Williams did not report pain during palpation or range of motion testing of the wrist, elbow or shoulder, all of which all were normal. (R. at 444.) There was a very mildly positive Tinel's sign at the elbow. (R. at 444.) Dr. Milam diagnosed mild left cubital tunnel syndrome, which he treated conservatively with therapeutic doses of Motrin, night splinting and sleeping with a pillow or rolled up towel to stabilize the elbow. (R. at 445.) Dr. Milam stated that while Williams might be a candidate for ulnar nerve decompression, due to multiple comorbidities, he would be at severe

risk for complications. (R. at 445.) He placed no restrictions on Williams. When Williams saw Dr. Nairn in December 2009, he did not report any problems with the left hand, nor did Dr. Nairn identify any abnormalities related thereto. (R. at 538.)

The only treating source stating an opinion regarding Williams's ability to work was Dr. Nairn, who, on December 21, 2009, wrote a letter "To Whom It May Concern," stating that Williams could not work due to heart and back problems. (R. at 543.) Dr. Nairn made no mention of Williams's left hand impairment.

Lastly, I find that Williams's testimony at the April 2010 hearing undermines his argument that the ALJ did not properly consider his left hand impairment. More specifically, Williams testified that he could peel potatoes, do a little laundry, wash dishes and perform similar household chores. (R. at 65.) He also testified that he was a "very good cook," noting that it took him a bit longer due to difficulty standing, not due to any problems with his left hand. (R. at 66.) Williams also testified that he worked for his father-in-law as a drywall finisher approximately four or five days monthly for four to six hours each day. (R. at 58-59.) He described this job as covering seams or nail holes in drywall with mud, using a trowel and a pan weighing up to 10 pounds. (R. at 60.) Clearly, performance of such activities undercuts Williams's argument that his left hand impairment was disabling.

It is for all of these reasons that I find that the ALJ's physical residual functional capacity finding regarding Williams's ability to use his left hand is supported by substantial evidence.

-15-

Williams next argues that the ALJ's finding that he is not disabled is not supported by substantial evidence because the vocational expert's testimony that he could perform a significant number of jobs in the national economy was based on an incomplete hypothetical. (Plaintiff's Brief at 11-12.) Again, I disagree. The vocational expert was asked to consider a hypothetical individual of Williams's age, education and work history, who could perform no more than sedentary work, who had mild problems gripping with the left hand due to two numb fingers, but who could use the left hand for most gross-type activities and grasping most of the time, who could perform fine manipulation with the other fingers most of the time, who could not reach overhead, who could not climb ladders, work at heights or operate dangerous machinery, who could not work with the public and who required an indoor, temperature-controlled work environment. (R. at 82.) The vocational expert testified that such an individual could perform the jobs of an unskilled clerical worker and a machine monitor, both existing in significant numbers in the national economy. (R. at 83.) Williams argues that because the ALJ did not include limitations to occasional climbing of ramps and/or stairs and occasional kneeling, balancing, crouching, crawling and stooping/bending, as the ALJ ultimately found in his residual functional capacity finding, the hypothetical to the vocational expert was incomplete and cannot constitute substantial evidence to support the ALJ's finding that he was not disabled.

It is true that the testimony of a vocational expert constitutes substantial evidence for purposes of judicial review only where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See*

-16-

*Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) is the ALJ's finding as to the claimant's residual functional capacity supported by substantial evidence; and 2) does the hypothetical adequately set forth the residual functional capacity as found by the ALJ? The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

As the Commissioner points out in his brief, a restriction to the occasional performance of postural activities does not significantly erode the sedentary occupational base. For instance, Social Security Ruling 83-14[8] states that most sedentary jobs do not require crouching, and most would only occasionally require stooping. *See* S.S.R. 83-14, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1992-May 2011 (West 2011). Social Security Ruling 96-9p also states that an ability to stoop occasionally is required in most unskilled sedentary occupations. *See* S.S.R. 96-9p, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1983-1991 (West 1992). Additionally, Social Security Ruling 96-9p states that postural limitations to such activities as climbing ladders, ropes or scaffolds, balancing, kneeling, crouching or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work. *See* S.S.R. 96-9p. That Regulation notes that a restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. *See* S.S.R. 96-9p.

---

[8] Social Security Rulings are the Social Security Administration's interpretations of the Social Security Act. *See Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995). "[T]hey are entitled to deference unless they are clearly erroneous or inconsistent with the law." *Pass*, 65 F.3d at 1204 n.3 (quoting *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989)).

The Fourth Circuit has held that 110 jobs in the regional economy did not constitute an insignificant number. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979). Here, the vocational expert testified that there was a total 175,000 jobs in the national economy and a total of 5,100 in the regional economy that the hypothetical individual could perform. (R. at 83.) As the Commissioner points out in his brief, in order for an insignificant number of jobs to exist, which would necessarily be a number less than 110, the postural limitations would have to erode more than 4,990 of the regional jobs identified. That would be a reduction of 98 percent of the occupational base. However, because the Social Security Regulations make clear that such postural limitations as exist in this case would not significantly erode the sedentary occupational base, I find that the ALJ's hypothetical to the vocational expert sufficiently set out Williams's residual functional capacity.

I note Williams's argument that the ALJ erred by incorrectly stating in her decision that the vocational expert identified the section numbers of the DOT corresponding to the jobs identified. It is true that the transcript of the ALJ's hearing does not reflect testimony by the vocational expert as to the specific DOT section numbers. However, such an omission by the vocational expert and incorrect assertion by the ALJ is of no import. Even assuming *arguendo* that such testimony is required, I find that the vocational expert's testimony that her findings were consistent with the DOT is sufficient to overcome any such alleged error.

Based upon my review of the record, and for the above-stated reasons, I find that substantial evidence exists in the record to support the ALJ's findings as to Williams's physical residual functional capacity and ultimate disability finding.

-18-

Case 1:11-cv-00074-JPJ-PMS   Document 16   Filed 07/27/12   Page 18 of 20   Pageid#: 643

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's physical residual functional capacity finding;

2. Substantial evidence exists to support the Commissioner's finding that a significant number of jobs existed in the national economy that Williams could perform; and

3. Substantial evidence exists to support the Commissioner's finding that Williams was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Williams's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2012):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written

objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: July 27, 2012.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE